JOSEFA CANDAL DE LÓPEZ ET AL., Plaintiffs and Appellants, v. SOCIEDAD ESPAÑOLA DE AUXILIO MUTUO Y BENEFICENCIA, Defendant and Appellee.

No. 3971. Argued January 20, 1927.—Decided March 16, 1928.

812

*R. Cucvas Zequeira* for the appellants. *Leopoldo Feliú* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Josefa Candal de López and her husband Ernesto López brought suit for damages alleged to have been caused by the negligence and malpractice in the diagnosis and treatment of an intracapsular fracture of the femur, by an X-ray specialist employed by defendant, and the physician and surgeon in charge of the hospital conducted by defendant.

Plaintiffs appeal from a judgment of dismissal rendered after a trial on the merits. The 8th assignment is that the court below erred in dismissing the action. In view of the reasons which render an affirmance inevitable, other propositions submitted in the brief for appellants need not be stated nor discussed.

The opening paragraph of the complaint contains an averment to the effect that defendant is an association organized for the purposes of charity and mutual aid of its members, under a law of 1887, and as such charitable organization maintains a sanatorium with X-ray and surgical departments, known as the *Auxilio Mutuo* which not only furnishes medical and surgical treatment to members but also provides a general clinic which is open to the public where all kinds of physical ailments are diagnosed and treated for a pecuniary compensation.

A demurrer for want of facts sufficient to constitute a cause of action was overruled by the court below, and the same question was raised by counsel for appellee at the hearing of the present appeal.

Defendant in its answer admitted the facts alleged in the first and second paragraphs of the complaint and in addition thereto, and by way of affirmative averment, pointed out that defendant at all times mentioned in the complaint and continuously thereafter also cared for a considerable number of insolvent and indigent patients, providing for them free hospital facilities, medicines and the gratuitous professional services of defendant's physicians and nurses.

Defendant also introduced in evidence a certified copy of articles 1 to 7 both inclusive of its Regulations on file in the office of the Executive Secretary of Porto Rico. From the first of these articles it appears that the purposes for which "La Sociedad Española de Auxilio Mutuo y Beneficencia" was organized were:

"First, to promote unity among Spaniards and their descendants, to foster their religious sentiments, and to exercise charity and mutual aid;

"Second, to bestow upon its members and upon indigent Spaniards special care and attention in cases of sickness or misfortune within the field of operations covered by such an institution;

"Third, to provide transportation for members who are unable to pay for such transportation in case of illness requiring a return to Spain;

"Fourth, to render final tribute to members in the event of death at the Sanatorium, or elsewhere in the case of an indigent Spaniard, giving such deceased member in either instance a solemn and decorous burial, and,

"Fifth, to aid with a single donation the needy families of deceased members. . ."

The second of these articles provides for the establishment of a sanatorium and of a central office for medical consultation; the third specifies that the building dedicated to the care of sick members shall contain wards for the care

of indigent Spaniards who may apply for assistance in case of sickness. The fourth authorizes the admission of paying patients upon the basis of a fixed schedule of rates. The fifth makes certain privileges available to members of the crew of registered vessels while in port, upon certain conditions likewise prescribed by schedule. The sixth and seventh establish rules governing certain of the matters just enumerated. The sources of income as indicated by the Regulations are first, initiation fees and monthly dues from members, second, other items (*ingresos extraordinarios*) intended to include, apparently, sums collected from paying patients admitted to the hospital and from vessels availing themselves of the privileges offered the crew while in port, and third, donations from those in sympathy with the movement.

The amount of $130 paid to defendant by Ernesto López for services rendered during the time that his wife, Josefa Candal de López, was in the hospital, as indicated by a receipt introduced in evidence by plaintiffs, covered but two items, to wit:

| | |
|---|---|
| 15 days (*estancias*) in the Sanatorium, at $6 | $90.00 |
| 2 X-ray photographs (*radiografías*) of the hip | 40.00 |
| | $130.00 |

There is nothing whatever to show the location or character of the room assigned to and occupied by the wife, or of the cost or quality of the food consumed by her or the kind of nursing provided for her, whether efficient and skilful or otherwise. Much less is there anything to indicate the actual value of the things and services last aforesaid. In the absence of any such showing, we have no reason to assume that like accommodations could have been secured at approximately the same, or at a similar rate, from any private hospital conducted for profit in the Island of Porto Rico. Ernesto López could not remember what he had paid two other X-ray specialists for subsequent X-ray photographs

of the hip, but thought that such payment had been made at the rate of $15 or $20 for each of such photographs. The statements of account or receipts for these subsequent disbursements, admitted by this witness to be in his possession, were never offered in evidence. At the time of the trial only one of three practising physicians, who made an independent and final examination some eleven months after the departure of the patient from the hospital, had presented his bill. The amount of that bill was ten dollars.

Manifestly the hospital bill does not include any charge either for a fluoroscopic examination made by the X-ray specialist on the afternoon of the arrival of the patient at the Sanatorium, or for an exhaustive examination of the patient said to have been made on the day following by the physician and surgeon in charge and by another hospital physician. The schedule of fees referred to in the Regulations was not produced at the trial and there is no evidence either of an intention to charge for medical services, diagnoses or treatments in the instant case or of any such custom or practice on the part of defendant.

As a fourth, separate and independent defense, defendant alleged:

"That the defendant is and was on the dates mentioned in the amended complaint an association for mutual aid and charity; that it has not nor has ever had as its object or purpose a pecuniary gain, either for itself or for its associates or members, but is supported by the mutual economic cooperation of its associates; that it was organized and is conducted in accordance with the law cited in the amended complaint."

As a fifth, separate and independent defense, defendant insisted that the amended complaint did not state facts sufficient to constitute a cause of action.

As a sixth, independent and separate defense, defendant averred:

"That none of the physicians mentioned in said amended complaint, Drs. Roldán and Soto Rivera, was an employee of the de-

fendant on the dates mentioned in said complaint, and that they performed their professional and technical functions in their respective positions independently and with no intervention on the part of the defendant or its directors.''

Articles 67 to 71 inclusive of defendant's Regulations are as follows:

''Article 67.—The establishments of the Association shall have the medical personnel which the Board of Directors may designate.

''Article 68.—All of the subordinate employees of the establishments of the Association shall be under the immediate direction of the Medical Director of the respective establishment. The Medical Director shall provide whatever he may deem convenient in the scientific and administrative order of the establishment of which he is in charge, reporting to the President all matters or modifications requiring immediate attention, so that this officer may decide what he may consider necessary.

''Article 69.—The Medical Director of each of the establishments of the Association shall propose to the Board of Directors the increase or reduction of the personnel as an efficient service or economy may require; and he shall also propose the promotion, remuneration or removal to which such employees may be entitled, according to their deportment in the fulfillment of their duties.

''Article 70.—The petitions presented by the subordinate employees shall be addressed through the Medical Director of the establishment in which they render their services to the Chairman of the Organization and Inspection Commission, provided the matter falls within their authority, and otherwise, he shall report to the Board of Directors so that the latter may decide what may be proper.

''Article 71.—When in the judgment of the Medical Director of any of the establishments of the Association any of the patients under his care shall need a surgical operation, or when he shall be in doubt as to the disease of the patient, the Medical Director shall consult with the other physicians of the Association. If there is diversity of opinion among them, or if they deem it necessary to consult another physician outside of the institution, they shall communicate immediately with the Chairman and .then it shall be decided what may be proper.''

Another affirmative averment contained in the answer was to the effect:

"That, in conformity with its own rules and practice, the two physicians mentioned were selected and appointed by the defendant for the positions of Medical Director and X-ray specialist, respectively, after thorough investigation as to their personal skill, experience and reputation, and in view of reliable information ratifying said investigation."

The proposition last mentioned was established by the evidence adduced at the trial and is practically uncontradicted and unchallenged.

The law under which the defendant institution was organized ordains that the following shall be subject to its provisions:

". . . the associations organized for religious, political, scientific, artistic, beneficial and recreation, or for any other licit purposes, other than a pecuniary or speculative interest."

It is further provided that—

"The following organizations shall be under the control of this act: The fraternities, the associations for mutual help or insurance. . ."

Section 2 of the same law excludes organizations other than those already enumerated, constituted for merely civil or commercial purposes, which are to be governed by the Civil or by the Commercial Code, as the case may be. See Alcubilla, 1887, 320.

The former Civil Code, the Revised Civil Code of 1902, and "An Act to incorporate associations not for pecuniary profit" approved March 9, 1911 (Comp. St. p. 107), all recognized not only the legal existence of the organizations sanctioned by the law of 1887 but also the essential difference and necessary distinction to be drawn between the objects and aims of such organizations and the purposes and pursuits of other corporate entities created and conducted wholly or primarily as business enterprises.

Section 291 of our Political Code, Title IX, Revenues, Chapter I, Assessment of Property, reads in part as follows:

"The following property shall be exempted from taxation:

  ✻    ✻    ✻    ✻    ✻    ✻    ✻

"(e) Every building used and set apart exclusively for religious worship, and the pews and furniture within the same; every building used and set apart for educational, literary, scientific or charitable purposes, and the furniture, appliances and apparatus appurtenant thereto; and every tract of land, not exceeding five cuerdas in extent upon which such building or buildings is or are situated: *Provided,* that such grounds and buildings are not leased or otherwise used with a view to the pecuniary profit of either the lessor or lessee."

In *Vélez* v. *Llavina,* 18 P.R.R. 634, it was pointed out that American doctrine and jurisprudence as to negligence and torts will be adopted and followed in this jurisdiction only to the extent that such doctrine and jurisprudence "are based on the principles of our Civil Code, or are derived from general principles of law not in conflict therewith." See also 38 Phil. Rep., *Cangco* v. *Manila Railroad Co.,* page 768. In *Vélez* v. *Llavina, supra,* it was held by a majority of the court as then constituted, to quote the headnotes, that:

"Liability for the acts or omissions of another can be enforced only when the exception to the general rule that a person shall answer only for his own acts or omissions is clearly specified in the law, because as said liability has to a certain extent the nature of a punishment, though a civil one, the principle should be applied that no person can be punished, even civilly, except when the law has so provided specifically.

"There is no provision whatever in section 1804 of the Civil Code nor in the other sections on this subject which makes the owner of an automobile or vehicle not devoted to the business of a common carrier liable for the negligent acts of the *chauffeur* of the automobile or driver of the vehicle.

"The wording of section 1804 of the Revised Civil Code prohibits courts of justice from fixing liability in cases not comprised in said section, for when a law specifies and determines the cases to which it is applicable, it cannot be applied to other cases not included

therein according to the legal principle *expressio unius est exclusio alterius.*

"The owner of a private automobile or vehicle not being liable for the acts of fault or negligence of the person employed by him as *chauffeur* if said automobile is not a part of the business of a common carrier, and it not having been proven in this case that the defendant's automobile is such, the plaintiff has no cause of action against the defendant for the damages suffered by reason of the negligent acts of the defendant's *chauffeur.*"

The soundness of the precedent thus established is not questioned by appellant herein and need not be discussed at this time. The doctrine of the *Vélez Case,* regardless of what the writer or others may think of it, is the law in this jurisdiction.

In *Alicea* v. *Aboy,* 23 P.R.R. 100, the gist of the opinion in *Vélez* v. *Llavina* was referred to and restated as follows:

"In the case of *Vélez* v. *Llavina,* 18 P.R.R. 634, after careful consideration we held that the owner of an automobile or other vehicle is not liable for the acts of fault or negligence of a servant employed by him as *chauffeur* if the said automobile does not form part of a public carrier service."

See also *Truyol & Co.* v. *West India Oil Co.,* 26 P.R.R. 321, where the first paragraph of the syllabus reads thus:

"The jurisprudence established by this court in the case of *Vélez* v. *Llavina,* 18 P.R.R. 634, is not that the owner of an automobile is liable for the acts of his chauffeur only when the automobile is a part or the whole of a public transportation concern. If the automobile is used in the service of any business and the chauffeur is an employee of said business concern and causes the damage in the discharge of his duties, the concern is responsible for the acts of its employee according to said jurisprudence and to sections 1803 and 1804 of the Civil Code."

In *Alicea* v. *Aboy, supra,* this court also held, the writer dissenting, that—

"The owner of an automobile or other vehicle is not liable for the acts of fault or negligence of a servant employed by him as *chauffeur* unless the automobile forms part of a public carrier serv-

ice, although the owner may be traveling in the automobile or vehicle at the time of the occurrence of the negligent or culpable act of his employee, for the statutes have not imposed such liability upon him in the specified exceptions to the general rule that he is liable for his own acts or omissions."

The word *empresa* or enterprise as ordinarily used in Spanish Law, and as defined by the Spanish dictionaries and encyclopedias, generally means a commercial enterprise or establishment. Thus, for example, in the *Enciclopedia Jurídica Española* by Francisco Seix, vol. XIII, p. 533, we find the following definition:

"*Enterprise*. In the sense in which this word is mostly used in the laws and in the civil and administrative provisions, it means the same as a mercantile or industrial association organized to carry on a certain work, business or important project; this does not mean to say that the *enterprise* may not belong to a single individual who invests capital therein, suffering the losses or reaping the profits of the business or transactions in which he may be engaged. In the latter case, however, the word *enterprise* is often substituted for that of *enterpriser*.

"Section 1903 of the Civil Code fixes the subsidiary responsibility of the directors of enterprises for the damages caused by their employees in the service of the branch in which the latter may be employed or in performance of their duties, if they are unable to show that they exercised the diligence of a good *pater familias* to prevent the injury."

Appellants, however, quote from 12 Manresa, 648, the following statement:

"The Supreme Court has decided (judgment of December 6, 1912,) that under the provisions of section 1903 the Directors of a newspaper published by an association of any character, maintaining any political ideals, who is placed under the authority of the enterprise, shall be considered as an employee."

From the standpoint of appellants, that is probably the nearest approach to the instant case in the annals of Spanish jurisprudence. Also the extract from Manresa points to the power of direct and immediate control which may be ex-

ercised by the owners of a newspaper over the editor, in his capacity of subordinate employee, as the *ratio decidendi* of the decision. The hypothetical existence of such supervision and control over a physician and surgeon in the diagnosis and treatment of disease, when placed in charge of a hospital by the owner who is not himself a physician and surgeon, or by a board of governors or directors composed of laymen, could hardly serve as a satisfactory basis for civil liability, even in the absence of evidence as to the independent character of the physician and surgeon so placed at the head of such an institution.

A newspaper may be, and often is, an unsuccessful venture when viewed from a financial standpoint. It may be maintained at a financial loss as an advertising medium, for purposes of political or other propaganda, or from purely unselfish and altruistic motives. But it can hardly be regarded as an eleemosynary institution. It is safe to assume that the Supreme Court of Spain has never held any benevolent association, organized under the law of 1887, liable in damages for personal injuries caused by the fault or negligence of employees, subordinate or otherwise, upon the theory that such an organization is an "enterprise" within the meaning of Art. 1903 of the Spanish Civil Code.

It is true, as pointed out in *Morales* v. *Caraballo,* 27 P.R. R. 544, that section 17 of the law regulating the operation of motor vehicles, enacted shortly after the decision of this court in *Alicea* v. *Aboy, supra,* makes the owner of any motor vehicle responsible for damages caused by negligence of the operator or chauffeur while such owner is in the vehicle. But that provision is in effect an amendment of section 1804 of the Civil Code as construed by this court, and does not alter or modify in any way the construction so placed upon the section last mentioned with reference to the liability of the owner of a private automobile when not in the car at the time of the accident. Not only by the terms of section 1804

as construed by this court, but now also by an implied legislative ratification and approval of such judicial construction the owner of an automobile not used as a part of an "enterprise," or in connection therewith, is exempt from all civil liability for the "fault" or negligence of his chauffeur, unless such owner be in the car at the time of the accident. But for the recent legislative limitation upon such exemption, the owner of a private car not used in connection with an "enterprise" would still be free from all legal responsibility even though sitting beside his chauffeur at the time of an accident due to the fault or negligence of such employee while acting within the scope of his employment.

Under the law as it now stands a business man who telephones for his car would not be responsible for injuries caused by the negligence of his servant, the driver, while on the way to town in response to the call. But if the same car, when not actually occupied by the owner, were used as a delivery wagon in connection with the business of the owner, and if an accident due to the negligence of the driver should occur while the car was being so used, then the owner would be liable. If the owner of a sugar mill were to send his private car with the chauffeur and an inspector of cane on a tour of inspection among the plantation owners who were parties to grinding contracts or contracts for agricultural advances entered into with such owner, he would be responsible for any accident that might occur as the result of negligence on the part of his driver. If a similar accident should occur while the chauffeur with the same car was on his way to a theater for the purpose of placing the vehicle at the disposal of the owner and his family after the performance in accordance with instructions received from such owner, the master would not be liable. The only logical basis for any such distinction must be found in the fact that in all cases where the owner can be held liable the car in

question, at the time of the accident, is earning for the owner a pecuniary profit on the money invested in the vehicle and on the cost of maintenance including the salary of the driver, while in all instances in which the owner can be regarded as immune the car is purchased and kept at considerable expense with no thought of a monetary return on the investment, but rather for the ease, comfort, convenience, pleasure and enjoyment of such owner.

It will not do to say, then, that the owner of a charitable hospital is responsible for negligence on the part of the driver of an ambulance while transporting indigent patients to or from such hospital, notwithstanding the exercise of due care and precaution in the selection and employment of such driver, because a benevolent institution is ''an establishment or enterprise'' within the meaning of section 1804 of the Civil Code. *A fortiori,* the owners and directors of a private hospital, organized and conducted with no thought or purpose of pecuniary profit, can not consistently be held liable for damages caused by negligence in the diagnosis and treatment of disease, on the part of a physician and surgeon, selected after thorough investigation as to his professional skill, experience and reputation and placed at the head of the institution.

The same rule would seem to apply in the case of an X-ray specialist similarly chosen and placed in a position of responsibility and trust as the more or less independent head of a separate and scientific department.

In *Vélez* v. *Llavina, supra,* it was held, again to quote the syllabus, that:

"In order that an automobile may be considered as devoted to the business of a common carrier it is necessary that the owner thereof employ the same regularly in the business of transporting passengers, conveying any one who pays the corresponding price. The fact that the owner of a private automobile hires it to certain

friends, but not to everybody, does not indicate that his automobile is devoted to the business of a common carrier."

By the same token, the mere fact that in a single instance a patient was charged at a very moderate rate for a room in a charitable hospital and a reasonable price for certain X-ray photographs is not enough to convert an eleemosynary institution into a commercial "establishment or enterprise."

The judgment below awarded costs to defendant. The assignment of errors does not directly challenge this pronouncement, and ordinarily, in the absence of such a specification, the question would not be noticed on appeal. In the instant case, however, the circumstances are peculiar and exceptional. But for the fact that defendant is not a responsible "enterprise" in the eye of the law as construed by the previous decisions of this court as hereinabove set forth, the judgment of the district court would have been reversed because of the facts disclosed by the record, and in lieu thereof the judgment of this court would have been entered in favor of plaintiffs, with or without costs. Heretofore this court has held that any error committed by a district court in awarding costs, if not pointed out and disposed of on appeal from the original judgment, will not be considered on appeal from an order approving a memorandum for costs. While generally in the absence of an assignment of error a pronouncement as to costs should not be disturbed, yet we are convinced that to let the pronouncement stand where the principal question raised was entirely debatable would, under the conditions shown in this opinion, be an injustice. Of our authority to modify the judgment in this regard no question can arise.

The judgment appealed from will be modified accordingly and, as modified, affirmed.

Mr. Justice Texidor took no part in the decision of this case.